Filed 2/23/15  P. v. Fryson CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>YOLANDA PEREZ FRYSON,<br><br>    Defendant and Appellant. | C067008<br><br>(Super. Ct. No. 62082316) |

Defendant Yolanda Perez Fryson was convicted of multiple counts of passing checks with insufficient funds for payment of the checks (Pen. Code, § 476a),[1] burglary (§ 459), and preparing false documentary evidence (§ 134).  She was also convicted of one count each of attempted extortion (§ 664/524), accepting a bribe (§ 68), attempted grand theft by false pretense (§ 664/487, subd. (a)), receiving stolen property (§ 496, subd. (a)), offering false evidence (§ 132), and forgery (§ 470, subd. (a)).  As to eight of the counts, the jury found true an allegation that the offense was committed while

---

[1]  References to an undesignated section are to the Penal Code.

1

defendant was released on bail or on own recognizance. Defendant was found guilty of 16 counts in all.

The trial court sentenced defendant to an aggregate sentence of nine years four months. The court made the bribery count the principal term, for which it imposed the upper term of four years plus a two-year enhancement. The subordinate terms imposed were counts 5 (non-sufficient funds) and 16 (forgery), each of which carried an eight-month sentence, which was one-third the midterm. A two-year enhancement was imposed as to count 16.

We shall reverse the convictions for bribery and forgery because we conclude defendant could not have had the requisite mental state for those offenses. However, the acts underlying those offenses were the bases for other convictions, and we shall affirm those convictions. The trial court imposed too many section 12022.1 enhancements, but because the enhancements were concurrent, defendant's aggregate sentence will not change as a result of reversing all but two of the enhancements. We reject defendant's remaining claims. We shall remand the matter for resentencing.

FACTUAL AND PROCEDURAL BACKGROUND

I

Convictions for Burglary and Passing Checks with Insufficient Funds

Counts 1 through 7 relate to a check kiting scheme conducted by defendant. The first act occurred on April 13, 2008, when defendant went to the Lincoln branch of US Bank and presented check number 1148 in the amount of $2,000 drawn on her Bank of America account. There were insufficient funds in her Bank of America account to cover the check. Defendant deposited $1,500 into her US Bank account, and took back $500 in cash. Counts 1 (nonsufficient funds) and 2 (burglary) are based on the April 13 actions.

Counts 3 (nonsufficient funds) and 4 (burglary) are based on the occurrences of April 15, 2008. On that day, defendant entered the Yuba City branch of US Bank and presented check number 1149 in the amount of $2,000 drawn on her Bank of America

2

account. There were insufficient funds in her Bank of America account to cover the check. Defendant deposited $1,000 into her US Bank account, and took back $1,000 in cash.

Counts 5 (nonsufficient funds), 6 (burglary), and 7 (burglary) are based on the occurrences of April 16, 2008. On that date defendant entered the Yuba City branch of US Bank at approximately 1:39 p.m. and presented check number 1150 in the amount of $4,000 drawn on her Bank of America account. She deposited $500 in her account at US Bank and took back $3,500 in cash. At approximately 5:44 p.m. the same day, defendant entered the Lincoln branch of US Bank and withdrew $1,100 from her account.

In May 2008, Kimberly Schrutt, a fraud investigator with US Bank, was assigned to investigate defendant's transactions. Schrutt confirmed that the Bank of America checks were returned for nonsufficient funds, that defendant's account with US Bank was in arrears several thousand dollars, and that defendant was the person who had made the deposits at US Bank. Schrutt called the telephone numbers US Bank had on file for defendant and left messages, but never received a call back.

Schrutt contacted Detective Jim Hudson of the Placer County Sheriff's Department on May 30, 2008. Hudson proceeded to obtain copies of all the checks and videos and still pictures of the incidents where the checks were passed. By comparing the person depicted in the videos and pictures with defendant's driver's license photo, Hudson was able to confirm that defendant was the person who had passed the checks.

Hudson interviewed defendant on June 3, 2008, at her place of employment. Defendant maintained that there had been a "bank mess up" and that she would pay back the bank after she was paid.

## II
### Convictions for Preparing False Evidence and Forgery

Robin Edwards was a Bank of America branch manager in Rocklin. Defendant contacted her in early spring 2008. Defendant requested a letter from the bank with

3

respect to some checks that had been returned. Defendant told Edwards that some checks had been returned in error and that she needed a letter to substantiate that fact. Edwards told defendant that the bank branches did not produce such letters and that she would need to go to a different department. Edwards initiated a phone call to the bank's customer service department on defendant's behalf so that defendant could discuss her request directly with them.

Defendant became upset with how long it would take to receive the letter, so Edwards asked the customer service representative if she could prepare the letter from a template sent to her by the customer service department. Edwards told defendant it would take about an hour for customer service to fax the template to her. Because defendant could not stay, she and Edwards agreed that Edwards would fax the letter to defendant at her work once it was finished. Edwards drafted the letter and faxed it to defendant. About a week later, defendant came by the bank to pick up the original letter from Edwards.

When Edwards testified, she recalled only one letter she had written for defendant. There were, however, three letters bearing what appeared to be Edwards's signature. One was dated April 29, 2008, and explained that three checks (check nos. 1148, 1149, & 1150) had been returned in error. When Edwards testified for the prosecution's case-in-chief in 2010, she believed this had been the letter she prepared for defendant. She testified that when she drafted the letter she had not known whether the checks had in fact been returned in error, and had assumed the customer service department had made that determination.

By the time Edwards testified in the prosecution's rebuttal case, she realized that she had not written the April 29, 2008 letter, even though it appeared to contain her signature. The April 29 letter described three checks (check nos.1148, 1149, & 1150) that had been returned in error. The letter Edwards actually wrote was dated February 25, 2008, and described only one check that had been returned in error—a check that had

4

nothing to do with this case. Only this letter was entered into evidence as an original. The other two letters admitted into evidence were copies. Defendant's own handwriting expert testified that the signature on the April 29, 2008 letter was an exact copy of the February 25, 2008 letter, meaning one of them was not genuine. The April 29, 2008 letter purportedly written by Edwards was the basis of count 9, preparing false documentary evidence.

The third letter was dated March 25, 2008, and purported to set forth a bank policy by which "Premier" clients could write checks up to $10,000 even if they did not have sufficient funds to cover the checks, and the bank would cover the checks for them. Edwards testified she had not written the letter, that the bank had no such policy, and that the signature, while similar to hers, was not hers. The March 25, 2008 letter was the basis of counts 14 (preparing false documentary evidence), 15 (offering false evidence), and 16 (forgery).

Justin Dargen was employed by Bank of America in the spring of 2008 at the Sunrise branch as a small business specialist. He knew defendant from when he had worked at the Roseville branch, where he had opened accounts for her and helped her with problems with her accounts and with moving money around. He also had a friend, Frank Marshall, who was dating defendant's daughter.

On June 6, 2008, defendant came to see him at the Sunrise branch around 3:00 p.m. Dargen was with another client, so he did not meet with defendant until almost 5:00 p.m., when the bank closed. Dargen was under the impression defendant was in law enforcement, because he had seen her badge a few times when she was opening accounts. He noticed the badge and asked her if she was in law enforcement, to which she responded, "Yeah."

When defendant finally was able to talk to Dargen, she told him she needed a letter from him because some checks had bounced due to bank error, because one of her deposits had not been correctly credited. She said the fees had already been erased, and

5

when he checked her account he saw that some fees had been erased, so her story sounded correct. He tried to call the branch that had handled the transaction, but because it was so close to closing no one answered. Because of his past dealings with defendant and the fact that she was in law enforcement, he found her story credible. He wrote the letter for her, even though he was unable to verify her story at that time.

The letter, addressed "To Whom It May Concern," stated: "Yolanda Fryson is a mutual client between your place of business and Bank of America; In the months of March, and April checks were returned due to a Bank Error. If this issue has caused any issues between your business and Ms. Fryson please correct them as the error was not cause[d] by her. The account numbers affected were . . . and . . . and the returned check numbers were 1148, 1149, and 1150."

Later, when a detective came in to ask Dargen about the letter, he made some phone calls and learned there had been no bank error. Count 8 (preparing false documentary evidence) is based on the Dargen letter.

On June 11, 2008, a few days after defendant's arrest, her attorney at the time, Christine Galves, wrote a letter to the Placer County District Attorney in an attempt to convince the district attorney that defendant was not guilty of committing any crime. The letter indicated that defendant was a "deputy" in "Yolo" County, that the overdrawn account was caused by a bank error, as evidenced by the enclosed Dargen letter, and that defendant had paid US Bank the amount of the overdraft in Galves's presence.[2] The letter enclosed copies of defendant's badge as an employee of Yuba County Health and Human Services Department, the Dargen letter, a bank statement showing an overdraft charge in the amount of $7,118.50, and a Bank of America cashier's check payable to US Bank in the amount of $7,118.50.

---

[2] Defendant was actually employed by Yuba County.

### III
### Convictions for Attempted Extortion, Bribery, and Attempted Grand Theft

Counts 10, 11, and 12 were based on the following circumstances. On June 5, 2008, defendant was placed on paid administrative leave from her job as a social worker for Yuba County Child Protective Services (CPS) due to the pending criminal investigation for passing bad checks. In her capacity as a CPS social worker, she was familiar with how a child abuse complaint is processed. She was on paid administrative leave, but she had no access to the CPS building, and she had to relinquish her identification and her badge.

Christopher Lindsay was acquainted with defendant through a friend, Beverly Avery. Lindsay's girlfriend at the time, Wendy Leveron, was a friend of Avery's, as was defendant. Prior to October 21, 2008, Lindsay had met defendant twice, but had never had a conversation with her. On October 21, as Lindsay was leaving his office, he received a phone call from defendant. Defendant told Lindsay that she was a CPS officer, and that some allegations involving Lindsay had come across her desk. She told Lindsay that even though she did not really know him, she knew the allegations could not be true.

Defendant told Lindsay that when the file came across her desk, she noticed Wendy Leveron's name, Leveron's son's name, and Lindsay's company name. Defendant "kind of beat around the bush," but finally told Lindsay he had been accused of having sex with a 17-year-old girl, molesting his girlfriend's son, and molesting the girlfriend's son's girlfriend. Defendant told Lindsay that she did not believe the allegations were true, but that she had seen many men get into trouble over false allegations.

Lindsay repeatedly asked defendant who had made the allegations, but she told him she would be breaking her code of ethics as a CPS officer to disclose that information. Defendant said she had 10 days to do something with the file, and that she

7

could either make it go away, or give it to her boss. She said she had kids to feed. She left Lindsay her cell phone number.

Lindsay called her back to try to get more information and to ask to see the file. He met with her at a restaurant, along with Leveron and Avery. Defendant said she had been to her office to get the file, and that she had the file with her, but she never produced the file. Lindsay asked defendant what his options were, and she told him that once she sent the file to her superior, he could be arrested at any time.

Defendant told Lindsay that a friend of hers was caught "helping" someone out in a similar fashion and had been fired. Defendant stated she could lose her job because what she was doing was unethical, and that she was worried about "feeding her kids." Defendant said she did not want to see anything happen to Lindsay, and that she could "make the file go away." By the end of the meeting, defendant had not yet decided whether to help Lindsay, because it could mean losing her job and she had to make money somehow for her mortgage and her kids. She told Lindsay to call her the next day after she had time to think about what to do.

The next morning, defendant called Lindsay and told him she had some information for him. She did not really have any new information, but kept telling him that she was having a hard time with what she was doing because it was unethical and she was afraid to lose her job. As defendant was talking about all of her bills, Lindsay believed she was asking for money, and that if he gave her money she would give him the file. Defendant had not made a decision about what to do by the end of the conversation.

Lindsay began to feel that something was "fishy." He spoke with an attorney. He then called Yuba County and asked to speak to defendant's supervisor. Lindsay learned from defendant's supervisor that there were no allegations against him, and that defendant had been on administrative leave for a number of months.

Yuba County had Lindsay talk to Detective Hudson. Detective Hudson had Lindsay place a call to defendant. Lindsay offered defendant $10,000 to make the file go

away. Defendant was hesitant, and fretted again about losing her job. Defendant told Lindsay she would have to think about his offer.

Lindsay finally made arrangements to meet with defendant to give her $10,000 in order to "make everything go away." Lindsay wore a wire to the meeting and Detective Hudson gave him an envelope of money to exchange with defendant for the file she claimed to have on Lindsay. Lindsay gave defendant the money, then gave the verbal cue that prompted the officers to move in.

IV
Convictions for Receiving Stolen Property

Count 13, receiving stolen property, was based on defendant's possession of a CPS badge. Defendant was issued her first CPS badge in 2002. When she was issued the badge, she signed a document entitled "Children's Services Badge Policy" stating the badge could not be used for any personal reason, and that upon resignation, termination, or transfer, the badge would be returned. The badge number issued to defendant in 2002 was 49. In August 2005 defendant reported she had lost her badge. She was issued another badge.

On June 5, 2008, when defendant was placed on administrative leave, she relinquished her badge, which was badge number 1. After defendant was arrested for the incident involving Lindsay, her residence was searched, and officers found a CPS badge, which was badge number 49--the badge defendant had lost several years before. A CPS officer is required to report and return any previously lost badge that is found. Defendant never reported that she had found her lost badge.

DISCUSSION

I
Insufficient Evidence of Intent to Accept Bribe

Section 68 provides, in pertinent part, as follows:

> "Every . . . employee, . . . of the State of California, [or] a county . . . therein, . . . who asks, receives, or agrees to receive, any bribe, upon any

9

agreement or understanding that his or her . . . action upon any matter then pending, or that may be brought before him or her in his or her official capacity, shall be influenced thereby, is punishable by imprisonment in the state prison for two, three, or four years . . . ."

The elements of the offense, as relevant here, are that: (1) the defendant was a county employee; (2) the defendant requested, took, or agreed to take a bribe; (3) the defendant made an express or implied representation that the bribe would unlawfully influence her official act; and (4) the defendant acted with the corrupt intent that her official duty would be unlawfully influenced. (CALCRIM No. 2603.) This last element of the offense, the requisite mental state, is the element defendant claims was not, and could not have been proven given the circumstances.

The required mental element is that the request to receive the bribe be "coupled with a corrupt intent to be influenced in one's official action . . . ." (*People v. Gliksman* (1978) 78 Cal.App.3d 343, 352.) The mental element is thus comprised of: (1) a corrupt intent, and (2) and an intent to be influenced in one's official duties. A corrupt intent is an intent to wrongfully gain a financial or other advantage for oneself or someone else. (CALCRIM No. 2603; § 7, subd. 3.) Defendant's intent was corrupt, but she could not have had an intent to be influenced in her duties as an employee of the county.

The reasons defendant could not have had such an intent in this case are that she was on administrative leave at the time she contacted Lindsay and therefore had no ability to perform her duties as a county employee, and that the file she proposed to "lose" was nonexistent, thus there was no official action on her part that a bribe could have influenced. While it is clear defendant committed some offense (she was also convicted of attempted extortion and grand theft on these facts) she did not commit the offense of taking a bribe because she lacked the required mental element.

Respondent cites several cases which it claims have held that defendant's conduct in accepting the money from Lindsay is within the purview of section 68. Respondent's reading of these cases is too broad.

10

The first is *People v. Megladdery* (1940) 40 Cal.App.2d 748 (*Megladdery*), overruled on other grounds in *People v. Simon* (2001) 25 Cal.4th 1082. Megladdery was the private secretary to the governor, and was found guilty by a jury of asking for a bribe with the intent of influencing the governor's decision with respect to a pardon. (*Megladdery,* at pp. 753-754.) Megladdery argued there was insufficient evidence to convict him of bribery because he had not been responsible for advising the governor on pardons, since that duty had been the responsibility of another secretary. (*Id*. at p. 783) The court rejected this argument, reasoning that the official duty of assisting the governor with pardons was imposed on the department of which Megladdery had been a member, and that if requested, he could have performed the work of the secretary assigned to that duty. (*Ibid*.)

Pertinent to the issue here, *Megladdery* stated that the People must charge and prove "that the subject matter upon which the bribe was to operate existed and could be brought before the public officer in his official capacity." (*Megladdery, supra*, 40 Cal.App.2d at p. 782.) Here, the subject matter upon which the bribe was to operate did not exist because defendant made it up out of whole cloth. Moreover, had the matter been true, defendant could not have acted on it in her official capacity because she was on administrative leave.

Respondent also cites *People v. Gaio* (2000) 81 Cal.App.4th 919. There, the issue was whether the requisite intent was to influence a specific, particular official act, rather than any matter that could conceivably come before the official. The court held: "it is sufficient that the evidence reflect that there existed subjects of potential action by the recipient, and that the bribe was given or received with the intent that some such action be influenced." (*Id*. at p. 929.) There is no similar issue here, and contrary to the statement in *Gaio*, no subject of potential action existed which defendant could have harbored an intent to influence.

11

Finally, respondent cites a quote from a concurring opinion in a case by the Supreme Court of Alabama, which stated: "The offence [of bribery] consists, in contemplation of the statute, in poisoning and corrupting the source and fountain of justice, and although the particular deleterious consequence designed to be effected by the parties has not ensued, the State nevertheless has an officer corrupted, and society has lost all protection for its rights, so far as the administration of the law by him is concerned." (*Barefield v. State* (1848) 14 Ala. 603, 607, conc. opn. of Chilton, J. (*Barefield*).) Respondent argues the fact that defendant was on administrative leave when she requested a bribe to make a file disappear that did not even exist "does not change the fact that her actions ' "poison[ed] and corrupt[ed] the fountain of justice" ' [citation] . . . ."

*Barefield* involved an attempt to bribe a judge. Because no suit had been brought before the judge at the time the offer was made, and no suit was afterward commenced, the majority held the evidence was insufficient to make out a crime. (*Barefield, supra*, 14 Ala. at p. 605.) The concurrence, which Respondent cites, agreed with the outcome of the majority opinion because it believed the indictment was fatally defective because it had not alleged that the case that was the subject of the bribe was within the judge's jurisdiction. (*Id*. at p. 606, conc. opn. of Chilton, J.) The concurrence differed with the majority opinion to the extent it held that the case must actually be brought before the judge after the offer of the bribe. (*Ibid*.) It was in this context that the concurrence stated that the law "abhors the least tendency to corruption," and that the offense of bribery consisted "in poisoning and corrupting the source and fountain of justice." (*Id*. at pp. 606-607.)

Nevertheless, the concurrence stated that the offense of bribery required that "the subject matter upon which the bribe was to operate existed, and could legally be brought before the officer in his official capacity." (*Barefield, supra*, 14 Ala. at p. 607.) These elements are absent here. The subject matter upon which the bribe was to operate did not

12

exist because there never was a file naming Lindsay as a child molester. Moreover, such a file could not have legally been brought before defendant in her official capacity at the time she asked for the bribe because she was on administrative leave.

Another critical point set forth in the concurrence is the nature of the harm the offense of bribery is intended to address. The harm is "in poisoning and corrupting the source and fountain of justice," and in the loss of protection to the state in its rights to the administration of the law. (*Barefield, supra*, 14 Ala. at p. 607.) In other words, bribery requires harm to the government itself, not just to the parties involved in the bribe. Harm to the government is absent in the present case, because there was no sabotage of the government's enforcement efforts, making defendant's actions more properly the subject of the offense of extortion.

## II
## Attempted Extortion Instructions

The trial court's instructions on the charge of attempted extortion were a train wreck. Nevertheless, we have repaired the train by demonstrating that the instructions were not incorrect, and were not so confusing as to mislead the jury.

Defendant was convicted of attempted extortion in violation of section 524. The section provides: "Every person who attempts, by means of any threat, such as is specified in Section 519 of this code, to extort money or other property from another is punishable by imprisonment in the county jail not longer than one year or in the state prison or by fine not exceeding ten thousand dollars ($10,000), or by both such fine and imprisonment." As is relevant, section 519 refers to threats to accuse an individual of a crime, or to impute to him a disgrace or crime, or expose a secret affecting him.

During a hearing regarding jury instructions, the prosecutor informed the court that attempted extortion was its own crime as set forth in section 524, but that there was no standard instruction for it. The prosecutor proposed that the instruction given by the court consist of the standard instruction on attempt plus the separate standard instruction

on the substantive crime, to which the trial court agreed.  The trial court directed the prosecutor to craft an instruction for attempted extortion.  The trial court began giving the instructions prior to closing arguments, but admitted they were "not perfect even at this point, but they are close enough that I can go ahead and give them."

Thereafter, the trial court gave its first effort at instructing the jury on the offense of attempted extortion.  The court first gave the standard instruction for attempt.  The first instruction on the offense of attempted extortion was as follows:

"The defendant is charged in Count 10 with attempted extortion by threat in violation of Penal Code Section 524.  To prove that the defendant is guilty of the crime of extortion, the People must prove that, one, the defendant threatened to accuse another person of a crime, two, when making the threat the defendant intended to use that fear to obtain the other person's consent to give the defendant money or property.

"Now, then it goes four.  Is that just a typo or is there a third element in there?  Take a look.

"[Defense Counsel]:  You said element number four?

"The Court:  No. Look.  It goes from two to four, so I want to make sure we are not missing something or is it just a typo and it should be three?

"Like I said, these are a little incomplete.  I thought it was good enough though to not keep you waiting any longer.

"Anyway, check that out.  I'm going to read it as it is.  I may have to modify it later.  It's listed as element four.  I'm going to assume that that's a type[o] and it's three.

"As a result of the threat, the other person then gave the defendant money or property.

"The term consent has special meaning here.  Consent for extortion can be coerced or unwilling as long as it is given as a result of the wrongful use of force or fear.  The threat must be controlling -- must be the controlling reason that the other person consented.  If the person consented because of some other controlling reason, the defendant is not guilty of extortion."

14

The written version of this instruction apparently was not included in the instructions sent to the jury room.

After the round of instructions that included the above instruction on attempted extortion, counsel gave their closing argument. Before the completion of closing arguments, the prosecutor told the trial court outside the jury's presence, that the parties had agreed to a jury instruction on attempted extortion that was taken from section 524, rather than trying to fashion an instruction from CALCRIM No. 1830. Defense counsel agreed, and noted that the attempt instruction would still be given.

After the completion of closing argument, the trial court read the new attempted extortion instruction as follows:

> "The defendant is charged in Count 10 with attempted extortion. In order to find the defendant guilty of this crime, the evidence must prove beyond a reasonable doubt that, one, the defendant attempted; two, by the means of threat to either accuse an individual, threatened -- I didn't write this, folks.
>
> "Accuse the individual threatened of a crime; or (B), expose or to impute him any deformity, disgrace, or crime, three, to extort money or property from another -- I will rephrase that, but that's it in essence what we need."

The written instruction sent to the jury room read:

> "Defendant is charged in Count Ten with attempted extortion.
>
> "In order to find defendant guilty of this crime, the evidence must prove beyond a reasonable doubt that:
>
> "1) Defendant attempted;
>
> "2) By means of any threat to either:
>
> > "a. accuse the individual threatened of a crime; or
> >
> > "b. expose or to impute to him any deformity, disgrace, or crime
>
> "3) to extort money or other property from another."

15

The trial court admitted it had some fine tuning to do on the instructions, but that it would get them to the jury. After the jury had begun deliberations, the court met with both attorneys to go over the instructions. The court asked if CALCRIM No. 1830 (the extortion instruction) had been given, and the prosecutor replied that they were replacing it with the section 524 instruction. The parties agreed that the section 524 instruction had been read to the jury and that both had agreed to the instruction.

In the afternoon of the first day of jury deliberations, the jury sent a written question to the court asking, inter alia, for a definition of extortion. During a discussion with the attorneys, the trial court stated that the section 524 instruction on attempted extortion mentioned the word extortion but did not define it. The court stated that it needed to give a definition of extortion. It was agreed that CALCRIM No. 1830 was the standard instruction on extortion, that it had originally been in the instructions, then had been removed because it was not needed.

The trial court then proposed to give the jury the definition of extortion contained in CALCRIM No. 1830, refer the jury to the attempt instruction (CALCRIM No. 460), and tell them that a person can be guilty of an attempt even though the crime was completed. The attorneys agreed.

The court then called the jury back into the courtroom, told the jury that they did not yet have answers to their questions, and told them he would give answers to the questions on Monday morning. The jury was excused for the weekend. After that, the court and attorneys agreed that in answer to the jury's question, the court would refer the jury to CALCRIM No. 1830, the section 524 instruction on attempted extortion, and CALCRIM No. 460. The court proposed to tell the jury that the instruction they had been given for attempted extortion contained the word "attempt" and the word "extort," and that attempt is described in CALCRIM No. 1830, and extort is described in CALCRIM No. 460. The parties agreed.

16

The court then said it would read its answer to the jury questions out loud "just to be absolutely safe." The written answer the court intended to read to the jury stated:

"Answer to Definition of extortion. I will read to you [CALCRIM No.] 1830 and in conjunction with the special instruction [section] 524 attempted extortion and [CALCRIM No.] 460 attempt and the interplay between those 3 instructions. In other words [section] 524 describes attempted extortion. In [section] 524 there is the word attempt and that is described in [CALCRIM No.] 460 and also the word extort and that is described in [CALCRIM No.] 1830 and I will read [CALCRIM No.] 1830 now and you will get a copy just like the other instructions."

If the clerk's transcript is accurate, two written versions of CALCRIM No. 1830 were given to the jury. One was an unamended version of CALCRIM No. 1830. The other was the official version with handwritten additions and deletions. The latter read as follows, with additions underlined and deletions interlineated:

"The defendant is charged [in Count <u>10</u>] with <u>attempted</u> extortion by (threat/~~[or] force~~) [in violation of Penal Code section ~~518].~~ <u>524</u>

"To prove that the defendant is guilty of this ~~crime~~ <u>completed extortion</u>, the People must prove that:

"*~~<Alternative 1A -- threatened to injure or used force>~~*

"~~[1. The defendant (threatened to unlawfully injure/ [or] used force against) (another person or a tird person/ [or] the property of another person or a third person),]~~

"*<Alternative 1B -- threatened to accuse of crime>*

"[1. The defendant threatened to accuse another person[, or that person's relative or family member,] of a crime;]

"*<Alternative 1C -- threatened to expose secret>*

"[1. The defendant threatened to expose a secret about another person[, or that person's relative or family member,] [or to expose or connect (him/her/any of them) with a (disgrace[,]/ [or] crime[,]/ ~~[or] deformity)~~]];]

17

"2. When (making the threat/ [or] ~~using force~~), the defendant intended to use that (fear/ ~~[or] force~~) to obtain the other person's consent (to give the defendant money [or property]/ ~~[or] to do an official act~~);

"3. As a result of the (threat/ ~~[or] use of force~~), the other person consented (to give the defendant money [or property]/ [or]~~to do an official act~~);

"AND

"4. As a result of the (threat/~~[or] use of force~~), the other person then (gave the defendant money [or property]/ ~~[or] did an official act~~).

"The term *consent* has a special meaning here. Consent for extortion can be coerced or unwilling, as long as it is given as a result of the wrongful use ~~of force or~~ fear.

"The (threat/~~use of force~~) must be the controlling reason that the other person consented. If the person consented because of some other controlling reason, the defendant is not guilty of extortion.

"[Threatening to do something that a person has a legal right to do is not a threat to commit an unlawful injury.]

"~~[The threat may involve harm to be inflicted by the defendant or by someone else.]~~

"~~[An *official act* is an act that a person does in his or her official capacity, using the authority of his or her public office.]~~

"[A *secret* is a fact that:

"1. Is unknown to the general public or to someone who might be interested in knowing the fact;

"AND

"2. Harms the threatened person's reputation or other interest so greatly that he or she would be likely to (give the defendant money [or property]/ [or]~~do an official act~~) to prevent the fact from being revealed.]

On the afternoon of Monday, November 1, court convened with both counsel and defendant present. The following discussion occurred on the CALCRIM No. 1830 instruction:

18

"THE COURT: . . . [¶] . . . So, I would read -- this is, essentially, what I read to them. I tried to get as close as I could without getting into anything controversial.

"So, okay. I would read all of Alternative 1-B, all of Alternative 1-C, 4, and then, yeah, this is, essentially, what I read.

"[PROSECUTOR]: Two, three, and four?

"THE COURT: Right."

Following this discussion, the court reconvened with the jury present and told them:

". . . I want to read the corrected version, which actually is pretty close to what I read to you this morning. But this is the one that the attorneys have agreed on. So, we're going to start with -- I'm going to start with 1830, extortion by threat or force. And you will get a copy of this, Penal Code Sections 518 and 519.

"The Defendant is charge[d] in Count Ten with attempted extortion by threat, in violation of Penal Code Section 524.

"To prove the Defendant is guilty of this extortion -- attempted extortion, should it not? [¶] . . . [¶] . . . [H]ow about if I put completed extortion? [¶] . . . [¶]

". . . To find the Defendant is guilty of completed extortion, the People must prove -- if you remember this morning, I read the alternatives, that I thought applied. And I think I got it pretty well.

"Alternative One did not apply, which had to do with threatened to injure someone, et cetera.

"Alternative One, that was 1-A.

"1-B, threatened to accuse of a crime.

"The Defendant threatened to accuse another person or that person's relative or family member of a crime.

"Alternative C, threaten to expose secret.

19

"One. The Defendant threatened to expose a secret about another person or that person's relative or family member or to expose or connect him or her or any of them with a disgrace or crime or deformity.

"All right. We call it without deformity. I do think that applies. [¶] . . . [¶]

". . . Two.

"When making the theft -- cross out using force.

"We didn't have any used force here? [¶] . . . [¶]

". . . The Defendant intended to use that fear -- and I'll cross out the word force -- to obtain the other person's consent to give the Defendant money or property or do an official act. That's one of the ones I was having trouble with. We don't have an official act here. Or you want that left? [¶] . . . [¶]

". . . So, I'll cross out official act.

"Everybody would agree: [¶] . . . [¶]

". . . As a result of the theft -- we don't have any force here -- the other person consented to give the Defendant money or properties or do an official act -- well, I'm crossing out -- and for -- as a result of the threat the other person then gave the Defendant money or property -- and crossing out official act.

"The term consent has a special meaning here. Consent for extortion can be coerced or unwilling, as long as it's given as a result of the wrongful use of fear.

"The theft must be the controlling reason that the other person consented. If the person consented because of some other controlling reason, the Defendant is not guilty of extortion.

"Threatened. Threatening to do something and the person has a legal right to do is not a threat to commit an unlawful injury.

"Secret is defined as unknown -- by the way, folks. When I went into the jury with your consent earlier today with 1830, I did not have page two. So that the definition of secrets, et cetera, was not -- was not touched upon.

20

"A secret is a fact that;

"One.  Is unknown to the general public or to someone, who has a right to be interested in knowing the fact; and.

"Two.  Harms the Defendant's harms the threatened person's [reputation] or others so greatly, that he or she would be likely to give the Defendant money or property to prevent the fact from being revealed."

After these and other additional instructions in answer to the jury's questions, the jury returned to continue deliberations.  The jury reached a verdict later that afternoon.

Defendant argues the instructions on attempted extortion were such "a mess" that the jury was not able to determine the correct instructions, and was not able to determine the elements of the offense.  We disagree.

To the extent defendant argues the extortion instruction was missing an element, it is true that the trial court gave an incomplete version of CALCRIM No. 1830 in the first instance.  However, that written instruction was never given to the jury, and the trial court indicated that the instruction appeared to be missing an element.  Thereafter, the trial court gave both an oral and written instruction on the crime of attempted extortion that was crafted from the language of section 524 and agreed to by both parties.  There is no claim that the instruction based on section 524 is incorrect or inadequate.  The trial court also read a modified version of CALCRIM No. 1830 in response to the jury's request for a definition of extortion.  This written instruction was given to the jury in both its modified and unmodified form.

While the first oral instruction given was missing an element (the element requiring the defendant's intent to use fear to obtain the victim's consent) the written instructions were not missing this element.  Where the oral instructions differ from the written instructions, the written instructions control.  (*People v. Mills* (2010) 48 Cal.4th 158, 201.)  We presume on this record that the jurors followed the court's written instructions, which contained all of the elements of extortion.  (*Ibid*.)

To the extent defendant argues the instructions were confusing because of the court's comments, which interrupted the reading of the instructions, the written instructions suffered no such interruptions. As indicated above, the written instructions are controlling. Certainly it would have been far preferable for the court to have settled on the final version of the instructions before attempting to read them to the jury. Nevertheless, the verbal instructions given were not so confusing that they failed to inform the jury of the elements of the offense when considered together with the written instructions.

As to defendant's claim that the jury received conflicting written instructions, the only conflict was in the instruction defining extortion, CALCRIM No. 1830. Only one written instruction was given on the offense of attempted extortion, so there is no conflict as to the offense itself. The jury was told that it was being given CALCRIM No. 1830 in response to its request for a definition of extortion because CALCRIM No. 1830 describes the word extort. The "conflicting" instructions consist of a modified and unmodified version of CALCRIM No. 1830, as shown above. The trial court told the jury that the modified version was the "corrected" version and the one on which the attorneys had agreed.

It is clear from these comments that the modified version of CALCRIM No. 1830 was the one the court intended the jury to follow. Even if the jury believed the unmodified version was the version intended by the court, there was nothing wrong or even misleading about the instruction. Instead, it contained provisions that were not applicable to the facts before the jury. The court instructed the jury that they should not consider any part of an instruction that had been crossed out, and that they should only consider the final version of the instructions. The court also instructed the jury that some of the instructions might not apply, and that they should follow only the instructions that applied to the facts of the case. We presume the jury followed these instructions. (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)

22

This appears to be a case where the court gave instructions before the instructions had been fully vetted. Nevertheless, in the end there was no error because the jury received the correct instructions, and there is no real dispute as to which instructions were applicable or what those instructions contained.

### III
### Conviction for Accepting a Bribe and Attempted Extortion

Defendant argues she cannot be convicted of both accepting a bribe and attempted extortion if both offenses are based on the same transaction. Her authority for this position is *People v. Powell* (1920) 50 Cal.App. 436, which held a defendant could not be guilty of both receiving a bribe and extortion because if a bribe is actually received, the property or money is not obtained through coercion. (*Id.* at pp. 441-442.) However, *Powell* also held that the offense of bribery included asking for a bribe, and that the defendant could be convicted of asking for a bribe and extortion based on the same transaction. (*Id.* at p. 442.)

In any event, the issue is not one we need decide, since we have concluded defendant's conviction for bribery must be reversed.

### IV
### Requisite Intent for Forgery Conviction

Defendant argues the offense of forgery requires an intent to defraud, and that there was no evidence presented of the necessary intent. She argues the evidence may have been sufficient to demonstrate an intent to deceive, but not an intent to defraud.

The forgery count was based on the forged signature of Robin Edwards on the March 25, 2008 letter. That is the letter that was addressed to defendant, and stated that as a "Premier" client she could write checks against her account up to $10,000, whether or not the account contained the money, as long as she deposited the money to cover the checks into the account within 30 days.

23

Intent to defraud is a necessary element of forgery. (*People v. Pugh* (2002) 104 Cal.App.4th 66, 72.) "An intent to defraud is an intent to deceive another person for the purpose of gaining a material advantage over that person or to induce that person to part with property or alter that person's position by some false statement or false representation of fact, wrongful concealment or suppression of the truth or by any artifice or act designed to deceive." (*Ibid.*)

This court has explained that because the forgery statute requires an intent to defraud, not every harm flowing from the deceptive use of a false document constitutes a forgery. (*Lewis v. Superior Court* (1990) 217 Cal.App.3d 379 (*Lewis*).) We explained that the term " 'defraud' " was synonymous with the word " 'prejudice' " at common law, and that "[t]here is no reason to suppose that the inclusion of [defraud] in section 470 broadens the ambit of the offense beyond that at common law." (*Id.* at pp. 397-398.) Thus, " '[w]hen the word "defraud" is used, it necessarily implies that advantage comes to the party defrauding, and corresponding damage to the party defrauded . . . .' (*United States v. Lee* (N.D.N.Y. 1882) 12 Fed. 816, 819; also see, e.g., *People v. Holtzman* (1916) 272 Ill. 447, 480 [112 N.E. 370, 371], 'Defraud, within the meaning of . . . [a false representation] statute, means to deprive one of a property right by deception.')" (*Id.* at p. 398.) Use of the word " 'defraud' " in the forgery statute requires that a consequence of the forgery "is the destruction of or imperilment of a right which is the subject of protection under the forgery statute, even if the property is not obtained by the forger and the right does not accrue to him." (*Ibid.*) *Lewis* refused to accept the argument that detriment to the interests of the public would count as a defrauding within the meaning of the forgery statute. (*Id.* at pp. 400-401.)

*Lewis* held that "[u]nless the consequential harm of the fabrication is a loss, damage, or prejudice of a legal right, generally a pecuniary or property right, there is no harm of the kind to which the statute is directed and hence no forgery." (*Lewis*, *supra*, 217 Cal.App.3d at pp. 383-384.) Pursuant to this reasoning, *Lewis* held that letters of

endorsement containing the forged signature of the President that were mailed to the electorate to urge them to vote for party candidates did not prejudice a legal right protected by the forgery statute. (*Id*. at pp. 383-384) We reasoned that although the defendant may have been guilty of misconduct impinging "on the public's interest in the integrity of its governmental institutions," there was "no suggestion of fraud relating to money or property." (*Id.* at p. 395.)

Respondent does not argue that the letter was written with the intent to obtain money, property, or some other right from either Bank of America or US Bank. As the forged letter makes clear, any checks written without sufficient funds by a "Premier" client would have to be repaid within 30 days. Moreover, as explained in section V, *post*, there is evidence that by the time the letter was written, defendant had reimbursed US Bank for the checks she had written without sufficient funds.

Respondent argues the legal right defendant intended to damage was the right of the People of the State of California, represented by the District Attorney of Placer County, to prosecute defendant for her fraudulent check activity without hindrance. Such a "right" of the public to prosecute a criminal without constraint is not the type of legal right which is the subject of protection under the forgery statute. Such an overbroad construction would make a "right" out of any number of interests that are not protected by the forgery statute, such as the "right" of the electorate to receive honest campaign literature, as in *Lewis*. Moreover, any such right is a right of the public at large, and *Lewis* rejected the "expansive view that any detriment to the interests of the public is a defrauding . . . ." (*Lewis*, *supra*, 217 Cal.App.3d at p. 400.)

*Lewis* cited *People v. Spann* (1986) 187 Cal.App.3d 400 405-406, stating that "the categorization of offenses by their allocation to different statutory structures may reveal how certain types of conduct should be treated and controlled." (*Lewis, supra*, 217 Cal.App.3d at p. 401, citing *Spann, supra,* at pp. 405-406.) As in *Lewis*, there are other specific statutes that prescribe criminal penalties for defendant's actions, i.e., acts that

25

interfere with the process of a criminal prosecution.  Defendant's conduct is properly placed in this category, and, in fact, defendant was convicted of both preparing and offering false documentary evidence.  These were the proper charges for forging the signature of Robin Edwards on the March 25, 2008 letter.

V
Sentence Enhancements

The second amended consolidated information alleged a section 12022.1[3] enhancement as to counts 9 (preparing false documentary evidence of the April 29, 2008 letter), 13 (receiving stolen property for withholding or concealing a CPS badge), and 16 (forgery of the March 25, 2008 Edwards letter).  The jury found defendant guilty of all the charges alleged, and found the section 12022.1 enhancement true as to counts 8 through 11 and 13 through16, even though the second amended consolidated information alleged the section 12022.1 enhancement only as to counts 9, 13, and 16.  The trial court imposed concurrent two-year terms for the enhancements associated with counts 8, 9, 10, 13, 14, and 15.  It stayed a two-year term for count 12, even though the jury did not return a true finding as to this count.  It imposed consecutive two-year terms for the enhancements on counts 11 and 16.  Defendant raises a number of arguments against the imposition of these enhancements.

A.  Unpleaded Enhancements (Counts 8, 10, 11, 14, & 15)

Defendant first argues that the imposition of a section 12022.1 enhancement as to counts 8, 10, 11, 14, and 15 violated her due process right to be advised of the specific charges against her because the enhancement as to those counts was not pleaded in the information.  We disagree.

---

[3] Subdivision (b) of section 12022.1 provides:  "Any person arrested for a secondary offense that was alleged to have been committed while that person was released from custody on a primary offense shall be subject to a penalty enhancement of an additional two years, which shall be served consecutive to any other term imposed by the court."

Due process is satisfied "as long as the information apprises the defendant of the potential for the enhanced penalty and alleges all facts necessary to establish its applicability." (*People v. Sok* (2010) 181 Cal.App.4th 88, 96, fn. 8.) "[W]here the information puts the defendant on notice that a sentence enhancement will be sought, and further notifies him of the facts supporting the alleged enhancement, modification of the judgment for a misstatement of the underlying enhancement statute is required only where the defendant has been misled to his prejudice." (*People v. Neal* (1984) 159 Cal.App.3d 69, 73.) Where the defendant cannot say that the preparation of her defense to meet the facts would have differed had the information alleged the enhancements to all the charges at issue, the judgment need not be modified. (*Id*. at pp. 72-73.)

The second amended consolidated information alleged a section 12022.1 enhancement as to counts 9, 13, and 16. This put defendant on notice to present a defense to the enhancement if she had one. Moreover, it became apparent during the trial that the section 12022.1 enhancement was being sought with respect to more counts than were alleged in the information. During one of the discussions on jury instructions, the court repeatedly noted that the prosecutor's proposed instruction on the enhancement allegation applied the enhancement to each count from 8 through 16. The prosecutor's closing argument made clear that the enhancement was being sought on other counts. The verdict forms indicated the enhancement was being sought as to counts 8 through 16, with the exception of 12. Defendant never raised an objection, indicating it was no surprise to the defense that the enhancement was being sought as to counts 8 through 16.

Defendant has not claimed that she would have prepared her defense any differently if she had known from the beginning that the section 12022.1 enhancement would be sought for counts 8 through 16. There is no need to modify the judgment for this reason.

27

B. Limiting the Number of Enhancements

The jury found true a section 12022.1 enhancement for each of counts 8 through 16, with the exception of count 12. The trial court imposed a section 12022.1 enhancement on each of counts 8 through 16, including count 12. With the exception of counts 11 and 16, the enhancements were concurrent. Defendant correctly argues that section 12022.1, subdivision (b) allows only one enhancement for each primary offense for which defendant commits a secondary offense while released from custody or own recognizance.[4] (*People v. Mackabee* (1989) 214 Cal.App.3d 1250, 1260-1262.) This is because section 12022.1 is an enhancement that goes to the nature of the offender rather than the offense. (*Mackabee,* at pp. 1261-1262)

The only evidence offered to prove that defendant was released on own recognizance after the first primary offense on June 3, 2008, was a promise to appear, indicating defendant had been released for burglary. Although defendant was subsequently charged with the additional offenses at issue in this case (i.e., passing checks with insufficient funds and additional burglary charges), the jury was presented evidence of only the single charge of burglary. Thus, for purposes of the section 12022.1 enhancement, there was only one primary offense charged on June 3, 2008, and only one section 12022.1 enhancement may be imposed for the primary offense of burglary. Respondent concedes the issue.

We shall also conclude that only one secondary offense, offering false evidence, is available for imposition of the section 12022.1 enhancement based on defendant's release

---

[4] " 'Primary offense' means a felony offense for which a person has been released from custody on bail or on his or her own recognizance prior to the judgment becoming final, including the disposition of any appeal, or for which release on bail or his or her own recognizance has been revoked. . . . [¶] 'Secondary offense' means a felony offense alleged to have been committed while the person is released from custody for a primary offense." (§ 12022.1, subd. (a).)

28

on bail on October 30, 2008.  We address defendant's arguments regarding the sufficiency of the evidence and the jury's findings to impose an enhancement for the second primary offense in the next section.  On remand, the trial court is directed to impose only two section 12022.1 enhancements, one for the primary offense of burglary, and one resulting from reoffense after release on October 30, 2008.

C.  Sufficient Evidence as to the Enhancements for Counts 14 and 15

In this case, there is evidence defendant committed several secondary offenses after being released on her own recognizance for the primary offense of burglary, but the evidence that defendant committed a secondary offense after being released on bail on October 30, 2008, for the primary offenses of attempted extortion, receiving a bribe, and receiving stolen property, consists solely of the evidence she prepared the March 25, 2008 letter on which she forged Robin Edward's signature.[5]  We shall conclude the evidence was sufficient to show the letter was prepared and offered after defendant's release on the second primary offense.  However, as to defendant's further claim that the jury was not instructed nor did it find the letter was prepared after her release from the second primary offense (as opposed to her release on either primary offense) we conclude she is correct as to count 14, preparing false evidence, but that the error is harmless as to count 15, offering false evidence.

_____

[5]  Detective Hudson testified he became aware of the April 29, 2008 Edwards letter, which was the basis of count 9, about the same time as "the extortion issue."  Thus, there is no evidence it was prepared after defendant was release on bail for the Lindsay incident.  Counts 10, 11, and 12 were based on defendant's efforts to extort Lindsay, thus they happened before she was arrested on those charges.  Count 13, receiving stolen property, was based on the CPS badge, which was recovered when her home was searched incident to her arrest for the Lindsay incident.  It could not have been the basis for the on bail or own recognizance enhancement.  This leaves only the March 25, 2008 Edwards letter, which was the basis of counts 14, 15, and 16.

29

Counts 14 (preparing false documentary evidence), 15 (offering false evidence), and 16 (forgery), were predicated on the March 25, 2008 letter containing the forged signature of Robin Edwards. The jury returned a true finding as to the section 12022.1 enhancement on each of these counts, and the trial court imposed the two-year enhancement on count 16 (forgery) and imposed a concurrent two-year term for each of counts 14 and 15 (preparing & offering false evidence). Evidence was presented that defendant was released from custody on her own recognizance following arrest for burglary on June 3, 2008. She was arrested again on October 30, 2008, and posted bail. This means that if the convictions for preparing or offering false documentary evidence are to be the basis for a second section 12022.1 enhancement, there must be sufficient evidence that the letter was prepared or offered after October 30, 2008.

Defendant argues there was no evidence to indicate when she prepared the forged letter dated March 25, 2008, thus no evidence to prove that when she *prepared* false evidence or committed forgery with intent to defraud she was released on bail or own recognizance. She concedes the enhancement was proven as to the *offering* false evidence count (count 15), but repeats her argument that the enhancement was not pleaded as to that count.

In reviewing a claim of insufficient evidence, we determine whether the record contains reasonable, credible evidence of solid value from which a reasonable jury could determine guilt beyond a reasonable doubt, and presume the existence of every fact reasonably deducible from the evidence in favor of the judgment. (*People v. Vines* (2011) 51 Cal.4th 830, 869.) The same standard applies when reviewing the sufficiency of the evidence to support an enhancement finding. (*People v. Wilson* (2008) 44 Cal.4th 758, 806.)

Detective Hudson first interviewed defendant on June 3, 2008, the same day she was arrested and released. Three days after that, Justin Dargen wrote the letter stating that the returned checks were a bank error. Five days later, defendant's attorney at the

30

time, Christine Galves, wrote a letter to the district attorney urging defendant's case be rejected, and citing the Dargen letter as evidence that no crime had been committed. No mention was made in Galves's letter of other letters from Bank of America. Detective Hudson did not become aware of the letter purportedly dated March 25, 2008, until a year later.

Galves testified she was retained by defendant very early on in the case. In December 2008, public defendant Julia Young was appointed to defendant's case. She served as defendant's counsel until the end of April 2010. Defendant provided the March 25, 2008 letter to Julia Young to be used in her defense. Both defendant's then attorney and the defense investigator spoke with Robin Edwards after receiving the March 25, 2008 letter, and Edwards told them she had not written the letter. Edwards spoke with the defense investigator in the spring of 2010.

A reasonable jury could have inferred that if the forged letter had been prepared while Galves was representing defendant, Galves would have used the letter in her attempt on June 11, 2008, to procure the dismissal of the case against defendant. Instead, there is no evidence defendant gave Galves the forged letter, and the attorney to whom defendant provided the letter, Julia Young, did not begin representing her until December 2008. This evidence is sufficient to support the inference that defendant did not prepare the letter until after Young began representing her.

However, the problem with respect to the imposition of the section 12022.1 enhancement is not whether the jury could have reasonably concluded the letter was prepared after October 30, 2008, but that the jury was never instructed it was required to make such a finding in order to impose a second enhancement with respect to counts 14, 15, and 16, and never made such a finding. Nevertheless, any error in failing to instruct the jury to make such a finding was harmless as to count 15, offering false evidence, because there was no reasonable probability defendant would have received a more favorable result had the court so instructed. (*People v. Watson* (1956) 46 Cal.2d 818,

31

837.)  Defendant admits that the fact of her offering the document in her defense would support a true finding on count 15, offering false evidence.[6]  The March 25, 2008 letter (the basis of count 15) had to have been *offered* after October 30, 2008, since defendant gave the letter to Julia Young to be used in her defense, and Julia Young was not appointed to defendant's case until December 2008.

We will remand for resentencing with instructions to impose only two section 12022.1 enhancements, and the second section 12022.1 enhancement must be imposed for the offense of offering false documentary evidence (count 15).[7]

## VI
## Stayed Sentences

Defendant claims the court erred by failing to stay the sentences on one of the burglary convictions (count 7), on one of the preparing false evidence convictions (count 14), and on one of the section 12022.1 enhancements (count 15) pursuant to section 654. To the extent her arguments have merit, there is no change to her aggregate sentence because these sentences were imposed concurrently.  Her argument is not meritorious as to count 7.

A.  Count 7

The factual basis for counts 5 and 6 (passing a check with insufficient funds & burglary) was that defendant entered a US Bank branch in Yuba City at 1:39 p.m. and presented a check in the amount of $4,000, drawn on her Bank of America account. There were not sufficient funds in the Bank of America account to cover the check.  Of the $4,000, defendant withdrew $3,500 in cash and deposited $500.  The factual basis for

---

[6]  She argues the enhancement was not proper as to count 15 because the information did not allege an enhancement as to that count, an argument we rejected, *ante*.

[7]  Although the trial court imposed and stayed an enhancement on count 12, the jury did not make a section 12022.1 enhancement finding as to count 12.  Therefore, no enhancement may be imposed for count 12.

count 7 was that approximately four hours later, defendant entered a US Bank branch in Lincoln and withdrew $1,100 from her account.

Section 654, subdivision (a), provides that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." In addition to limiting punishment for multiple convictions arising out of a single act, section 654 limits punishment for multiple convictions arising out of a course of conduct deemed to be indivisible in time where the defendant entertained a single principal objective. (*People v. Beamon* (1973) 8 Cal.3d 625, 639.)

Where an " 'act or omission' " is a course of conduct, as opposed to a single act, it may be punished more than once if it constitutes a " 'divisible transaction' . . . ." (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1252.) The determination whether a course of conduct is divisible depends on (1) whether all of the offenses were incident to one objective, (2) whether the course of conduct is divisible in time, and (3) whether the defendant had an opportunity to reflect and to renew her intent before committing the next crime. (*Id.* at p. 1253; *People v. Louie* (2012) 203 Cal.App.4th 388, 399.)

In this case defendant's course of conduct was divisible in time. During the approximately four hours between withdrawing the first $3,500 and the second $1,100, defendant had an opportunity to reflect and renew her intent. Section 654 does not mandate stay of the sentence on count 7.

B.  Count 14

Defendant argues the sentence on count 14 should have been stayed, rather than imposed concurrently, because the conviction for preparing false evidence and offering false evidence were the means of accomplishing one objective in which she harbored only one intent. The People concede the argument. As we are reversing defendant's conviction on count 16, forgery, we shall direct the trial court to impose only one

33

sentence for preparing or offering false evidence (counts 14 & 15), and to stay the sentence on the other conviction.

C. Enhancement to Count 15

The trial court stayed the sentence in count 15, offering false evidence. It nevertheless imposed a concurrent two-year enhancement on count 15. Punishment for an enhancement cannot be imposed separately from the underlying offense. (*People v. Smith* (1985) 163 Cal.App.3d 908, 914.) When the sentence for the underlying offense is stayed, the enhancement must also be stayed. (*Ibid.*) On remand we will direct the trial court to stay any enhancements for which it has stayed the underlying conviction.

VII
Proposition 47

We granted defendant's request to file a supplemental brief arguing the provisions of Proposition 47, enacted by the voters at the November 4, 2014, general election apply retroactively to reduce her conviction for receiving stolen property from a felony to a misdemeanor.

Proposition 47 required "misdemeanors instead of felonies for nonserious, nonviolent crimes . . . unless the defendant has prior convictions for specified violent or serious crimes." (Ballot Pamp., Gen. Elec. (Nov. 4, 2014) text of Prop. 47, p. 70.) It also added section 1170.18 to the Penal Code, which provides that a person who is "currently serving a sentence for a conviction . . . of a felony or felonies who would have been guilty of a misdemeanor under the act that added this section . . . had this act been in effect at the time of the offense may petition for a recall of sentence before the trial court that entered the judgment of conviction in his or her case to request resentencing . . . ."

Defendant correctly notes that the crime of receiving stolen property is now a misdemeanor if the value of the property did not exceed $950 and the defendant did not have a disqualifying prior conviction. (§ 496, subd. (a).) She argues that pursuant to *In*

34

*re Estrada* (1965) 63 Cal.2d 740, 744-748, the provisions of Proposition 47 operate retroactively to reduce her receiving stolen property conviction to a misdemeanor.

*Estrada* stated: "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply." (*Estrada, supra*, 63 Cal.2d at p. 745.) This includes "acts committed before its passage provided the judgment convicting the defendant of the act is not final." (*Ibid*.)

Thus, *Estrada* held that if an amended statute mitigates punishment, the amendment will operate retroactively to impose the lighter punishment unless there is a saving clause. (*Estrada, supra*, 63 Cal.2d at p. 748.) The Legislature may signal its intent by including an express saving clause making the amendment prospective, "or its equivalent." (*People v. Nasalga* (1996) 12 Cal.4th 784, 793, fn. omitted.)

*People v. Yearwood* (2013) 213 Cal.App.4th 161, held that a provision in Proposition 36, the Three Strikes Reform Act of 2012, which created a postconviction resentencing procedure similar to the one in Penal Code section 1170.18, was the "functional equivalent" of a saving clause. (*Yearwood,* at p. 172.) Referencing *Yearwood* this court has concluded that a defendant subject to Proposition 47 is limited to the statutory remedy of petitioning for recall of sentence in the trial court after the judgment has become final. (*People v. Noyan* (2014) 232 Cal.App.4th 657, 672.)

We agree with the result in *People v. Noyan, supra*, 232 Cal.App.4th 657. The procedure set forth in section 1170.18 applies to "[a] person currently serving a sentence for a conviction . . . of a felony or felonies who would have been guilty of a misdemeanor under the act . . . ." Defendant is such a person. There is no need to ask whether Proposition 47 is retroactive as to her. The act clearly states the manner in which any

35

adjustment in her sentence is to be accomplished.  Defendant is limited to the statutory remedy of petitioning the trial court for recall of sentence when her judgment is final.

DISPOSITION

The convictions for accepting a bribe (count 11) and forgery (count 16) are reversed.  The case is remanded for resentencing with directions to select a new principal term and to select a new subordinate term to replace the term imposed for count 16 (forgery).  If the trial court intends to impose a second Penal Code section 12022.1 enhancement, count 15, offering false evidence, must be used as the second subordinate term.  No more than two enhancements pursuant to Penal Code section 12022.1 may be imposed.  The sentence on either count 14 (preparing false documentary evidence) or count 15 (offering false evidence) must be stayed, and the enhancement on any stayed sentence must be stayed.  In all other respects, the judgment is affirmed.


    BLEASE         , Acting P. J.


We concur:


    NICHOLSON     , J.


    MAURO       , J.


36